**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COREWELL HEALTH WILLIAM BEAUMONT UNIVERSITY HOSPITAL,
3601 W 13 Mile Road, Royal Oak, MI 48073

*Plaintiff,*

vs.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services,
200 Independence Avenue, S.W.,
Washington, D.C. 20201;

THOMAS J. ENGELS, in his official capacity as Administrator, Health Resources and Services Administration,
5600 Fishers Lane, Rockville, MD 20852;

and

HEALTH RESOURCES AND SERVICES ADMINISTRATION,
5600 Fishers Lane, Rockville, MD 20852

*Defendants.*

Civil Action No. 1:26-cv-03111

**COMPLAINT**

Plaintiff Corewell Health William Beaumont University Hospital by and through its attorneys, Polsinelli PC, brings this Complaint against Robert K. Kennedy, Jr., Secretary of the Department of Health & Human Services, Thomas J. Engels, Administrator, Health Resources and Services Administration, and the Health Resources and Services Administration (collectively, "HRSA"), and alleges as follows:

## PRELIMINARY STATEMENT

1. Corewell Health William Beaumont University Hospital ("Beaumont Hospital") is a nonprofit teaching hospital located in Royal Oak, Michigan, which is committed to providing lifesaving, necessary, and often complex care to patients regardless of their insurance status or ability to pay.

2. As a safety-net hospital, Beaumont Hospital treats a significantly higher-than-average number of low-income, uninsured, and Medicaid-enrolled patients. Because caring for a disproportionate share of uninsured and underinsured populations often results in substantial financial losses, Beaumont Hospital, like other safety-net providers, depends on the drug pricing program established under Section 340B of the Public Health Service Act (the "340B Program") to offset the financial burden associated with the important role Beaumont Hospital serves in its region.

3. The 340B Program was created for the express purpose of supporting safety-net hospitals like Beaumont Hospital by imposing ceilings on the prices that drug manufacturers may charge for certain covered outpatient drugs. *See* Veterans Health Care Act of 1992, Pub. L. 102-585, § 602, 106 Stat. 4943, 4967–71 (1992) ("340B Statute").

4. The 340B Statute achieves this purpose by directing the Secretary of the Department of Health and Human Services ("HHS") to ensure that qualifying hospitals (known as "covered entities") do not pay more than the maximum amount permitted under the statute for covered outpatient drugs. *See* 42 U.S.C. § 256b(a)(1). Specifically, the 340B Statute orders the Secretary to enter into pharmaceutical pricing agreements with drug manufacturers whose products are reimbursable under federal health care programs, whereby participating manufacturers agree

that covered entities are entitled to purchase covered outpatient drugs at the same price applicable to state Medicaid programs. *See id*.

5. Administration of the 340B Program is delegated to the Health Resources and Services Administration ("HRSA"), an agency within HHS. *See*, *e.g.*, 89 Fed. Reg. 28,643 ("The Health Resources and Services Administration administers section 340B of the Public Health Service (PHS) Act, which is referred to as the '340B Drug Pricing Program' or the '340B Program.'").

6. The 340B Statute expressly identifies 15 different categories of health care providers that qualify as covered entities and are therefore entitled to participate in the 340B Program. *See* 42 U.S.C. § 256b(a)(4). Among those entities are Disproportionate Share Hospitals ("DSHs"), which are nonprofit hospitals that: provide care to low-income populations not eligible for Medicare or Medicaid pursuant to a government contract, or who are owned or operated by a unit of state or local government; maintain a disproportionate share adjustment[1] exceeding 11.75% as reflected in their most recent Medicare Cost Report; and do not obtain covered outpatient drugs through a group purchasing organization. *See* 42 U.S.C. § 256b(a)(4)(L).

7. Notably, however, the 340B Statute does not treat all categories of covered entities the same—certain restrictions and/or heightened requirements apply to particular types of covered entities as made clear by the statute.

8. For example, the 340B Statute empowers the Secretary to develop and implement a "certification" process for two particular types of covered entities—specifically, those who receive funding under the Ryan White HIV/AIDS Program (Section 256b(a)(4)(J)) or under

[1] Disproportionate share adjustment is a figure included in a hospital's Medicare Cost Report calculated based on the number of low-income patients treated by the hospital during the cost reporting period. *See* 42 U.S.C. 1395ww(d)(5)(F).

dedicated federal programs relating to treatment of sexually transmitted diseases or tuberculosis (Section 256b(a)(4)(K))—in order to verify their eligibility prior to participating in the 340B Program. 42 U.S.C. § 256b(a)(7).

9. Conversely, the 340B Statute provides only two eligibility requirements that must be met in order for other types of covered entities, including DSHs, to be entitled to receive the 340B Program's discounts: (1) compliance with the statute's prohibitions against duplicate discounts and the diversion of covered outpatient drugs; and (2) permitting the Secretary and/or the applicable manufacturer to audit records relevant to compliance with the aforementioned prohibitions. *See* 42 U.S.C. § 256b(a)(5).

10. Indeed, the 340B Statute only authorizes the Secretary to remove and/or prevent an otherwise eligible covered entity from accessing the program when the Secretary determines that the covered entity violated the prohibitions on diversion or duplicate discounts and further finds that the violation was "systematic and egregious as well as knowing and intentional." 42 U.S.C. § 256b(a)(4).

11. The 340B Statute also limits the types of drugs that three specific categories of covered entities can purchase under the program. In particular, free-standing cancer hospitals as defined under Section 256b(a)(4)(M), critical access hospitals as defined under Section 256b(a)(4)(N), and rural referral centers as defined under Section 256b(a)(4)(O), are excluded from purchasing drugs "designated by the Secretary under section 526 of the Federal Food, Drug, and Cosmetic Act for a rare disease or condition," referred to as "Orphan Drugs," at 340B Program pricing. 42 U.S.C. § 256b(e).

12. This means that the savings derived by a covered entity who is permitted to purchase Orphan Drugs under the 340B Program, such as a DSH, are higher than the savings

derived by the types of covered entities who are excluded from purchasing Orphan Drug, such as a rural referral center ("RRC").

13. RRCs like DSHs, must contract with the government to provide health care services to low-income individuals ineligible for Medicare (or must be owned or operated by a unit of state or local government), cannot obtain covered outpatient drugs through a group purchasing organization, and must provide care to a disproportionate share of uninsured or underinsured patients to be eligible as a covered entity under the 340B Statute. *See* 42. U.S.C. § 256b(a)(4)(O). *See also* HRSA, *Rural Referral Centers*, https://www.hrsa.gov/opa/eligibility-and-registration/hospitals/rural-referral-centers (last visited Jul. 23, 2026).

14. Critically, however, RRCs are only required to have a "disproportionate share adjustment percentage equal to or greater than 8 percent," (Section 256b(a)(4)(O)) whereas DSHs must have a disproportionate share adjustment greater than 11.75%. 42. U.S.C. § 256b(a)(4)(L).

15. Since 2017, Beaumont Hospital has consistently met the definition of a "covered entity" under the 340B Statute and, as such, has been entitled to purchase covered outpatient drugs under the 340B Program at all relevant times. *See* 42 U.S.C. § 256b(a)(4). In particular, beginning in 2024 and each year thereafter, Beaumont Hospital has met the criteria to participate in the 340B Program as a DSH under subsection (L) of the 340B Statute's definition of covered entity. *See* 42 U.S.C. § 256b(a)(4)(L).

16. Even though Beaumont Hospital has consistently met the definition of a DSH under the 340B Statute since April 2024, and, as such, has been entitled to purchase Orphan Drugs under the 340B Program at all relevant times, HRSA has unlawfully prevented Beaumont Hospital from accessing 340B pricing for Orphan Drugs for six months via the agency's arbitrary and unlawful registration system.

17. In particular, HRSA's quarterly registration system—which limits covered entities from accessing 340B pricing until HRSA approves their registration under a single category of eligibility, and requires covered entities who wish to purchase 340B drugs under a different category of eligibility to re-register entirely—forced Beaumont Hospital to prematurely change its covered entity designation from DSH to RRC during HRSA's January 2026 registration window in order to prevent any potential lapses in 340B participation if the hospital's cost report for fiscal year 2025, which had yet to be finalized, later showed a disproportionate share adjustment rate lower than 11.75%.

18. On April 1, 2026, the same day that Beaumont Hospital's RRC designation became effective pursuant to HRSA's quarterly review process, Beaumont Hospital's DSH designation was no longer effective, because—even though Beaumont Hospital met DSH criteria at that time—agency guidelines required Beaumont Hospital to re-register as a DSH and wait until at least the beginning of the next quarter, July 1, 2026, for the DSH designation to be reinstated.

19. HRSA thus prevented Beaumont Hospital from accessing 340B pricing for Orphan Drugs from April 1, 2026 to July 1, 2026 by refusing to change Beaumont Hospital's covered entity designation within the agency's database from an RRC to a DSH, even though Beaumont Hospital demonstrably met DSH criteria. Rather, HRSA insisted that Beaumont Hospital wait until the agency's next registration period, submit an application with materials evidencing that Beaumont Hospital meets DSH criteria, and then wait for HRSA to certify this change—after which, such change would only become effective at the beginning of the following quarter.

20. Worse yet, even after Beaumont Hospital complied with HRSA's registration requirements—which the agency has no statutory authority to impose in the first place—HRSA rejected Beaumont Hospital's application to register as a DSH, simply because Beaumont Hospital

did not provide an attestation by the hospital's "Authorizing Official" with the specific documents that the hospital submitted within the arbitrary timeframe set by HRSA. This meant that Beaumont Hospital would have to wait an additional quarter to be reinstated as a DSH in HRSA's 340B database, and thus, would be unable to purchase Orphan Drugs under the 340B Program for yet another three months, from July 1, 2026 to October 1, 2026.

21. HRSA's arbitrary, capricious, and unlawful actions have caused and will continue to cause irreparable harm to Beaumont Hospital, as it will be unable to purchase Orphan Drugs under the 340B Program for six months in total, losing millions of dollars. Such loss is unsustainable for a nonprofit, safety-net provider, like Beaumont Hospital, if it is to continue serving indigent patients in its region to the same degree it has historically.

22. At all relevant times, Beaumont Hospital has met the eligibility criteria for DSH status, and as such, is squarely entitled to purchase Orphan Drugs via the 340B Program, yet has been, and continues to be, excluded from purchasing them at the 340B pricing. The only way that Beaumont Hospital can recover its losses is if this Court overturns HRSA's unlawful actions and requires that the agency retroactively reinstate Beaumont Hospital's DSH designation under the 340B Program. Beaumont Hospital has a very narrow window to coordinate with its drug wholesaler and the applicable manufacturers to obtain the discounted prices it is entitled to as a DSH under the 340B Program, and, thus, brings the instant action urgently requesting that the Court provide both declaratory and injunctive relief to prevent imminent, irreparable harm.

## JURISDICTION & VENUE

23. Beaumont Hospital seeks relief from a final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 700, et seq., the 340B Statute, 42 U.S.C. § 256b, and the

Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. This Court, thus, has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. § 1361.

24. HRSA's decision to arbitrarily, capriciously, and unlawfully exclude Beaumont Hospital from DSH classification under the 340B Program (thus preventing it from purchasing Orphan Drugs under the 340B Program) from April 1, 2026 to October 1, 2026 is a final agency action causing Beaumont Hospital to suffer harm for which there is no other adequate remedy under the law. Thus, there exists an actual controversy for which Beaumont Hospital is entitled to judicial review and relief under 5 U.S.C. §§ 702, 704–706.

25. An actual, ongoing, and substantial controversy exists between the parties concerning HRSA's continued exclusion of Beaumont Hospital from DSH classification under the 340B Program and whether such action complies with the requirements of the 340B Statute. Therefore, this Court may declare the rights and legal relations of the parties under 28 U.S.C. §§ 2201, 2202.

26. Venue is proper in and the United States District Court for the District of Columbia has personal jurisdiction over Defendants because each of them is either an officer/employee of the United States named in their official capacity, or an agency of the United States, and each of them is either located in, conducts substantial business in, and/or has regular and systematic contact with this District. 28 U.S.C. § 1391(e).

## PARTIES

27. Beaumont Hospital is a nonprofit teaching hospital in Royal Oak, Michigan, affiliated with the Oakland University William Beaumont School of Medicine.

28. Beaumont Hospital is the only accredited Adult Level 1 trauma center in Oakland County, and one of only three Level 1 trauma centers serving the larger Detroit metro area, with

1,131 acute-care beds and an emergency department with 114 exam rooms, 16 triage bays, 4 trauma bays, and 53 medical observation beds.

29. Beaumont Hospital is recognized as a top performing regional and state hospital, frequently ranking at or near #1 in the state of Michigan, and is nationally ranked in 9 adult specialties and 21 complex adult procedures and conditions.[2]

30. Beaumont Hospital is operated by Corewell Health ("Corewell"), a nonprofit health care system based in Michigan, devoted to improving health and working towards a future where health is simple, affordable, equitable, and exceptional.[3] In the year 2024 alone, Corewell provided over $1.3 billion in total community benefit programs, which included traditional charity care, health clinics, education, research, and under-reimbursed costs of government programs like Medicaid, a significant percentage of which can be attributed to the care provided to indigent patients at Beaumont Hospital.[4]

31. Corewell relies on the 340B Program to help fulfill its mission and expand the availability of vital healthcare for patients facing financial hardship and limited access to care.

32. Beaumont Hospital has been eligible to participate in the 340B Program since 2017. Through its participation in the program, Beaumont Hospital has expanded both the scope and availability of services for underserved populations while funding initiatives designed to improve healthcare access in a region with many residents facing economic uncertainty.

---

[2] *See* U.S. News & World Report, *Corewell Health William Beaumont University Hospital*, https://health.usnews.com/best-hospitals/area/mi/beaumont-hospital-6442245 (last visited Jul. 22, 2026).
[3] Corewell Health, *About Corewell Health*, https://corewellhealth.org/about (last visited Jul. 22, 2026).
[4] Cause IQ, *Corewell Health Group Return*, https://www.causeiq.com/organizations/spectrum-health,611740292/ (last visited Jul. 22, 2026).

33. Defendant Robert F. Kennedy, Jr. is the Secretary of Health and Human Services. Kennedy maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201, and is named in his official capacity only.

34. Defendant Thomas J. Engels is the Administrator of the Health Resources and Services Administration, an operating division within the Department of Health and Human Services. Engels maintains an office at 5600 Fishers Lane, Rockville, Maryland 20852, and is named in his official capacity only.

35. Defendant Health Resources and Services Administration ("HRSA") is an agency within the U.S. Department of Health and Human Services, whose main office is located at 5600 Fishers Lane, Rockville, Maryland 20852.

## LEGAL BACKGROUND

### The 340B Program

36. The 340B Program was created by Congress in 1992 for the specific purpose of protecting safety-net providers from the significant increases in drug prices they were facing after the Medicaid Drug Rebate Program was created in 1990 and pharmaceutical manufacturers began hiking up drug prices and shifting costs to safety-net providers. *See* H.R. Rep. No. 384, 102d Cong., 2d Sess. Pt. 2 at 10-12 (1992).

37. Congress achieved this by directing the Secretary of HHS to enter into pharmaceutical pricing agreements with drug manufacturers whose products are eligible for reimbursement under federal programs, under which agreements qualifying safety-net providers—defined by the statute as "covered entities"—may not be charged more than the ceiling price established by the 340B Statute. *See* 42 U.S.C. § 256b(a)(1).

38. The 340B Statute expressly identifies 15 distinct categories of health care providers that qualify as covered entities and are therefore entitled to purchase covered outpatient drugs at discounted prices. *See* 42 U.S.C. § 256b(a)(4).

39. One such type of covered entity are nonprofit hospitals that contract with the government to furnish health care services to low-income populations, who have a disproportionate share adjustment exceeding 11.75% during the most recent Medicare cost reporting period, and who do not obtain covered outpatient drugs through a group purchasing organization. *See* 42 U.S.C. § 256b(a)(4)(L). These hospitals are commonly referred to as Disproportionate Share Hospitals ("DSHs").

40. Another type of covered entity are Rural Referral Centers ("RRCs") who are designated by the Centers for Medicare & Medicaid Services ("CMS") under Section 1886(d)(5)(C)(i) of the Social Security Act. RRCs provide health care services to low-income individuals pursuant to government contracts and must maintain a disproportionate share adjustment of at least 8%. *See* 42 U.S.C. § 256b(a)(4)(O).

41. Although the statute identifies multiple categories of covered entities who are all eligible to participate in the 340B Program, it does not impose identical requirements on each. Instead, Congress established distinct eligibility standards and limitations for particular provider types.

42. Particularly relevant to the instant matter are the 340B Statute's heightened certification requirements for entities receiving government funding under certain programs relating to treatment of HIV/AIDS, sexually transmitted diseases, and tuberculosis. *See* 42 U.S.C. §§ 256b(a)(4)(K)-(J). The 340B Statute provides that such entities only qualify as a covered entity if they are "certified by the Secretary" as specified under Section 256b(a)(7).

43. Section 256b(a)(7), in turn, directs the Secretary "develop and implement a process for the certification" of these specific entities, including a "requirement that an entity applying for certification under this paragraph submit information to the Secretary." 42 U.S.C. §§ 256b(a)(7)(A), (B).

44. By contrast, the 340B Statute is devoid of any comparable certification requirement for any of the other 13 categories of covered entities identified therein. Rather, the 340B Statute imposes only two conditions of participation on other covered entities. First, covered entities must comply with the statute's prohibitions against diversion of covered outpatient drugs and duplicate discounts, and second, covered entities must agree to permit audits by the Secretary or participating manufacturers in order verify their compliance with the first condition. 42 U.S.C. § 256b(a)(5).

45. By expressly requiring agency certification for certain categories of covered entities, while omitting any comparable requirement for other types of covered entities, Congress plainly did not intend that program eligibility for all covered entities be contingent on agency certification.

46. While the Secretary may establish procedures governing the administration of the 340B Program, Congress narrowly circumscribed that authority. For example, the 340B Statute directs the Secretary to "notify" manufacturers and certain state agencies "of the identities of covered entities" (Section 256b(a)(9)), and to establish procedures for the limited purpose of ensuring compliance with the statutory prohibitions against diversion and duplicate discounts, including issuing billing guidance aimed at preventing duplicate discounts. 42 U.S.C. § 256b(d)(2)(B)(iii).

47. The 340B Statute also authorizes the Secretary to create "a single, universal, and standardized identification system by which each covered entity site can be identified by

manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section," (42 U.S.C. § 256b(d)(2)(B)(iv)), impose sanctions on covered entities that knowingly and intentionally violate the statutory prohibitions on diversion or duplicate discounts (Section 256b(d)(2)(B)(v)), and to promulgate regulations establishing an administrative dispute resolution process for resolving issues between manufacturers and covered entities. *See* 42 U.S.C. § 256b(d)(3).

48. Thus, while the 340B Statute authorizes HRSA to create a registration database, nothing within the statute authorizes HRSA to prevent covered entities, who otherwise comply with all applicable statutory requirements, from receiving 340B pricing unless and until they meet HRSA's specific registration requirements.

49. To the contrary, the 340B Statute recognizes only one basis for disqualifying an otherwise eligible covered entity, and that is where the Secretary determines that the entity knowingly and intentionally committed systematic and egregious violations of the prohibitions on diversion or duplicate discounts. *See* 42 U.S.C. § 256b(a)(4).

**HRSA's Registration Requirements for Covered Entities**

50. Pursuant to the Secretary's authority under the 340B Statute to establish "a single, universal, and standardized identification system by which each covered entity site can be identified," (42 U.S.C. § 256b(d)(2)(B)(iv)), HRSA created a database known as the 340B Office of Pharmacy Affairs Information System ("OPAIS"). *See* HRSA, *340B OPAIS User Guide for Covered Entity Users*, at 5 https://340bpricing.hrsa.gov/Help/CoveredEntity/Resources/PDFUserGuides/340BCoveredEntityUserGuide.pdf (last visited Jul. 23, 2026) (hereinafter "OPAIS User Guide").

51. OPAIS "allows manufacturers and wholesalers to verify that an organization requesting 340B pricing is an active participant in the 340B program." *Id*. In order to be listed as an active participant in OPAIS, and receive 340B pricing, HRSA requires covered entities to register in the database. *Id*.

52. But, according to HRSA, covered entities have to do more than simply register in OPAIS to receive 340B pricing—they must wait until one of HRSA's quarterly registration periods and submit a registration application with specific documents requested by the agency to confirm their eligibility to participate in the program. *See* HRSA, *How Hospitals Register for the 340B Program*, https://www.hrsa.gov/opa/registration/hospital-registration-instructions (last visited Jul. 23, 2026) (hereinafter "HRSA Registration Instructions").

53. In particular, HRSA instructs covered entities that they will need to have certain documents ready when registering including: (1) their last filed Medicare Cost Report; (2) "Worksheet E Part A"; and (3) if the covered entity is a children's hospital, "Worksheet S-3". *Id*.

54. Nonprofit hospitals must also submit documents showing their nonprofit status, and a "copy of the contract that is in place between the hospital and the state or local government unit." *Id*.

55. HRSA provides several examples of the types of documents that sufficiently show nonprofit status, including the "hospital's charter," "articles of incorporation, bylaws, or other documents," or the "[h]ospital's latest filed IRS-990 form, or other official IRS document." *Id*.

56. If HRSA deems the application and documents provided by the covered entity are sufficient, then the covered entity is approved to participate in the 340B Program. However,

according to HRSA's policy, the covered entity must wait until the start of the following quarter before they are able to make purchases under the 340B Program. *See id*.

57. Accordingly, a health care provider that otherwise satisfies the statutory definition of a covered entity is denied access to 340B pricing until HRSA approves its registration, and that approval does not even become effective until the beginning of the next calendar quarter.

58. Under HRSA's policy, "[c]overed entities must recertify their eligibility every year" with HRSA. HRSA, *340B Eligibility*, (last updated Jun. 2024) https://www.hrsa.gov/opa/eligibility-and-registration (hereinafter "*340B Eligibility*").

59. HRSA recognizes that a health care provider may satisfy the criteria for more than one type of covered entity under the 340B Statute. *See* HRSA, *Rural Referral Centers* (last updated June 2022), https://www.hrsa.gov/opa/eligibility-and-registration/hospitals/rural-referral-centers. Although the 340B Statute imposes no additional eligibility criteria or limitations on providers that qualify under multiple covered entity classifications, HRSA nevertheless requires those providers to designate a single eligibility category and "abide by requirements and guidelines for that type of eligible organization/covered entity once enrolled." *Id*.

60. HRSA requires that, when a covered entity learns of any change in its eligibility status, the covered entity immediately report such change through OPAIS and stop purchasing drugs through the 340B Program. *See 340B Eligibility*.

61. HRSA's recertification requirement, quarterly registration periods, and requirement that covered entities select only one category of 340B eligibility when registering, means that covered entities who are registered as RRCs and are excluded from purchasing Orphan Drugs under the program, but who later learn that they meet the 340B Statute's criteria for eligibility to purchase Orphan Drugs as a DSH, will not be able to make any such purchases until the covered

entity re-registers with HRSA, the agency approves the change, and the next calendar quarter commences.

## FACTUAL BACKGROUND

### HRSA Unlawfully Prevented Beaumont Hospital, Who Met the 340B Statute's Definition of a DSH, from Maintaining the Status and Purchasing Orphan Drugs Under the 340B Program from April 1, 2026 Through October 1, 2026.

62. Beaumont Hospital has participated in the 340B Program since 2019. Since 2024, Beaumont Hospital has met the definition of a covered entity under the 340B Statute as both a DSH and an RRC.

63. In particular, at all relevant times, Beaumont Hospital: (1) has been, a private nonprofit hospital that has a contract with a state or local government to provide health care services to low-income individuals who do not qualify for Medicare or Medicaid benefits; (2) has not obtained covered outpatient drugs through a group purchasing organization; and (3) has a disproportionate share adjustment in excess of 11.75%. Beaumont Hospital thus meets the definition of both an RRC and DSH under the 340B Statute. *See* 42 U.S.C. § 256b(a)(4)(L), and (O).

64. In 2024, Beaumont Hospital registered with and was approved to participate in the 340B Program by HRSA as a DSH. Beaumont Hospital's participation in the 340B Program as a DSH enabled it to focus resources on enhancing care and supporting lasting improvements in access to healthcare in the region it serves.

65. Each year, Beaumont Hospital's fiscal year ("FY") ends on December 31, and the hospital files its Medicare Cost Report approximately five months later on or about May 31. In early 2026, while reviewing preliminary data from the end of FY 2025, Beaumont Hospital's cost reporting team identified that the hospital's disproportionate share adjustment could be at risk of dropping below 11.75% on its upcoming cost report.

66. While this information from Beaumont Hospital's cost reporting team was merely based on preliminary projections—because HRSA only permits covered entities to select one category of 340B eligibility and demands that covered entities who learn of any change in its eligibility status immediately report such change through OPAIS, stop purchasing drugs through the 340B Program, and then re-register—Beaumont Hospital had to take precautionary measures to avoid any gaps in its ability to access 340B pricing in case it was later determined that it no longer met DSH criteria, and the hospital was forced to re-register as an RRC.

67. Therefore, during HRSA's January 2026 registration window, Beaumont Hospital submitted an application to register as an RRC under the 340B Program. HRSA approved Beaumont Hospital's RRC registration on February 4, 2026. Effective on April 1, 2026, Beaumont Hospital's covered entity designation within OPAIS changed from DSH to RRC.

68. Beaumont Hospital did not want to relinquish DSH status if it indeed continued to meet DSH criteria, but based on HRSA's arbitrary and unlawful registration requirements, it was forced to do so.

69. By HRSA's next registration window in April 2026, Beaumont Hospital's team had confirmed that its preliminary projections were incorrect—the hospital indeed met DSH criteria during FY 2025 with a disproportionate share adjustment of 12.39%. Beaumont Hospital thus filed a new registration application and submitted documents demonstrating it met DSH criteria, including all materials requested by OPAIS at the time of filing, on or about April 15, 2026

70. However, even if the registration was approved, due to HRSA's arbitrary and unlawful registration process, Beaumont Hospital would be unable to purchase Orphan Drugs under the 340B Program as a DSH entity for an entire quarter, even though the hospital undoubtedly met DSH criteria.

71. To make matters worse—despite Beaumont Hospital submitting documents clearly demonstrating DSH eligibility, and having previously been registered as a DSH under the 340B Program within the last year—HRSA rejected Beaumont Hospital's April 2026 application for DSH reinstatement.

72. The stated basis for HRSA's rejection was that Beaumont Hospital did not, in the agency's view, timely respond to an OPAIS notification that stated: "Please attach your contract with State/Local Government. Please attach IRS Form 990 or other documentation that demonstrates nonprofit status."

73. This notification was reportedly sent on April 17, 2026, and gave Beaumont Hospital five days, until April 22, 2026, to respond before HRSA would automatically reject the hospital's application.

74. Beaumont Hospital's "primary contact" within OPAIS complied with HRSA's request and uploaded the requested documentation on April 20, 2026. Yet HRSA rejected Beaumont Hospital's registration application on the basis that these materials were not submitted with an attestation by the hospital's "Authorizing Official" prior to April 22, 2026.

75. This was an arbitrary and egregious position for HRSA to take considering the agency could have confirmed that Beaumont Hospital met both the nonprofit and contracting requirements not only from the documents filed with the hospital's most recent application—including Beaumont Hospital's FY 2025 Medicare Cost Report, on which the hospital's nonprofit status was reflected on Worksheet S-2, Part 1, Line 21—but also the materials submitted by Beaumont Hospital in its prior registration applications, including the RRC registration that had been approved by HRSA just three months prior.

76. HRSA's arbitrary rejection combined with its unlawful registration requirements meant that Beaumont Hospital would have to wait yet another quarter, until October 1, 2026, to be reinstated as a DSH under the 340B Program.

**HRSA Affirms Its Final Agency Action by Denying Request for Reconsideration**

77. On June 1, 2026, counsel for Beaumont Hospital reached out to HRSA to request that the agency reconsider its rejection and permit Beaumont Hospital to be reinstated in the 340B Program as a DSH as of April 1, 2026.

78. Counsel explained to HRSA that Beaumont Hospital had previously been registered as a DSH, but then re-registered as an RRC as a preemptive measure to avoid any potential gaps in access to 340B pricing with this change becoming effective on April 1, 2026. Counsel continued that, as demonstrated by Beaumont Hospital's FY 2025 Medicare Cost Report, the hospital had continually maintained DSH status, even though it was registered as an RRC.

79. Counsel further explained that, with its April 2026 registration application, Beaumont Hospital had submitted all documents necessary to demonstrate it met DSH criteria under 42 U.S.C. § 256b(a)(4)(L) and consistent with HRSA's OPAIS guidelines.

80. Counsel also stated that HRSA did not have statutory authority to use its registration system to prevent and/or delay a covered entity's access to the 340B Program when the entity squarely met statutory requirements.

81. Thus, counsel requested that HRSA not only reconsider its decision to reject Beaumont Hospital's most recent application, but also that the agency retroactively reinstate the hospital's DSH designation back to April 1, 2026, now that Beaumont Hospital had received and provided HRSA with confirmation that it indeed met DSH criteria at all relevant times.

82. On June 11, 2026, Josh Volpe, Operations Branch Chief for HRSA's Office of Pharmacy Affairs, responded to this request for reconsideration, stating that HRSA would not "reverse the rejection of the DSH reinstatement registrations submitted during the April 2026 registration period." As such, Beaumont Hospital would have to "submit its DSH reinstatement registrations during the next open registration period, July 1–15, 2026."

83. Mr. Volpe continued that Beaumont Hospital needed to "ensure all required documentation is attached at the time of submission," and "[i]f approved, the reinstatement registrations will receive an effective start date of October 1, 2026."

84. HRSA has thus made a final decision that Beaumont Hospital cannot participate in the 340B Program as a DSH for six months, and during that time will be excluded from purchasing Orphan Drugs through the 340B Program, despite Beaumont Hospital being entitled to do so under the 340B Statute.

85. HRSA's actions are inconsistent with the 340B Statute and unlawfully deprive Beaumont Hospital, an unquestionably eligible covered entity, of the discounted pricing Congress guaranteed under the program. As a result, Beaumont Hospital has no meaningful alternative but to seek declaratory and injunctive relief through this action.

**HRSA's Actions Are an Unlawful Exercise of Its Limited Authority Under the 340B Statute**

86. HRSA has acted beyond the limits of its statutory authority by refusing to allow Beaumont Hospital to participate in the 340B Program as a DSH from April 1, 2026 through October 1, 2026, even though the hospital has undoubtedly met all qualifications to receive 340B pricing as a DSH entity under the statute.

87. Outside of two particular types of covered entities not applicable in this case, the 340B Statute does not authorize HRSA to condition a covered entity's statutory entitlement to 340B pricing on prior agency registration or approval. *See* 42 U.S.C. § 256b(a)(7).

88. Congress expressly identified the entities eligible to participate in the 340B Program, prescribed the requirements those entities must satisfy, and limited the circumstances under which an otherwise eligible covered entity may be excluded from participation. Because the statute contains no registration prerequisite, HRSA lacks authority to create one.

89. Once a hospital establishes that it qualifies as a covered entity, the only requirements under the 340B Statute that the covered entity must meet before accessing 340B prices are those related to the prohibitions on duplicate discounts and diversion. *See* 42 U.S.C. § 256b(a)(5).

90. The 340B Statute further limits the Secretary's authority to exclude an otherwise eligible covered entity from the program. Disqualification is authorized only upon a determination that the entity knowingly and intentionally committed systematic and egregious violations of the prohibitions on diversion or duplicate discounts. 42 U.S.C. § 256b(a)(4). Because Congress expressly identified the sole basis for excluding an eligible covered entity from the program, it did not authorize HRSA to impose additional barriers to participation through agency-created registration requirements or filing deadlines.

91. Nothing in the text of the 340B Statute authorizes HRSA to withhold program participation from an otherwise eligible covered entity via a registration/certification process that the agency has no authority to create.

92. Recent decisions in this circuit confirm that HRSA lacks authority to engage in rulemaking and cannot prevent covered entities from accessing 340B pricing by imposing extra-statutory registration requirements.

93. Specifically, the D.C. Circuit Court of Appeals held that HRSA "lacks rulemaking authority over the section 340B program." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). Thus, HRSA cannot issue rules or guidelines with the force of law, which HRSA has undoubtedly done in this case.

94. Additionally, an opinion from the United States District Court for the District of Columbia recently held that the 340B Statute does not authorize HRSA to impose registration requirements as a condition of program participation. *Albany Med. Health Sys., et al. v. HRSA*, Case No. 23-cv-03252 (APM), ECF No. 35 at 14 (D.D.C. Mar. 3, 2026). As that opinion articulated, "Congress clearly understood how to impose agency certification as a precondition to 340B program participation. That it chose not to do so for hospital entities . . . strongly suggests that Congress meant for there to be no such precondition." *Id*. at 15.

95. At all relevant times, Beaumont Hospital has indisputably met the definition of a DSH under the 340B Statute and, in fact, submitted evidence to HRSA showing that it met DSH criteria during FY 2025.

96. Beaumont Hospital's April 2026 registration application included a copy of its FY 2025 Medicare Cost Report verifying that Beaumont Hospital was a nonprofit and had a disproportionate share adjustment in excess of 11.75%.

97. Additionally, three months prior, in January 2026, Beaumont Hospital submitted a registration application—which HRSA approved—that showed Beaumont Hospital was a

nonprofit hospital who contracted with state/local governments as required to qualify for both RRC and DSH status under the 340B Statute.

98. Beaumont Hospital also submitted a registration application in 2024, and an application for recertification in 2025, both of which HRSA approved as demonstrating the hospital met DSH criteria.

99. Nonetheless, HRSA still prevented Beaumont Hospital from participating in the 340B Program as a DSH because it "did not provide the required documentation to support its hospital classification as a 'private nonprofit hospital with a contract with a state or local government.'"

100. Because Beaumont Hospital indisputably satisfied—and continues to satisfy—the statutory definition of a covered entity, HRSA acted contrary to both the text and purpose of the 340B Statute by denying Beaumont Hospital access to 340B pricing as a DSH entity solely because it did not meet registration requirements that the agency has no authority to impose.

101. In particular, HRSA exceeded the statutory authority granted to it by Congress when it refused to permit Beaumont Hospital from making purchases under the 340B Program as a DSH between April 1, 2026 and October 1, 2026, exclusively because of the agency's quarterly registration process.

102. HRSA's OPAIS User Guide limits registration to the first two weeks of each calendar quarter and provides that an otherwise eligible entity may not begin purchasing drugs at 340B prices until the start of the following quarter after HRSA approves its registration. *See* 340B OPAIS User Guide for Covered Entity Users, *supra*. The 340B Statute contains no language authorizing HRSA to postpone a covered entity's statutory entitlement to 340B pricing through an agency-created registration calendar.

103. In practice, HRSA's quarterly registration process prevents otherwise eligible covered entities from purchasing covered outpatient drugs at the statutory ceiling price until both HRSA has approved their registrations and a new calendar quarter has commenced, regardless of when those entities became statutorily eligible.

104. Neither the text of the 340B Statute nor its legislative history supports HRSA's assertion of authority to delay 340B pricing for an entity that indisputably qualifies as a particular covered entity. Congress established the criteria for eligibility and did not authorize HRSA to suspend a covered entity's statutory entitlement through a quarterly registration process of the agency's own creation.

**HRSA's Actions Are Arbitrary, Capricious, Contrary to Law, and an Abuse of Discretion**

105. HRSA's refusal to approve Beaumont Hospital's request that it change its covered entity designation from an RRC to a DSH based exclusively on a delay in Beaumont Hospital providing an attestation from its Authorizing Official to accompany additional and unnecessary documents that had been uploaded to OPAIS, which has further prevented Beaumont Hospital from accessing the 340B Program between July 1, 2026 and October 1, 2026, is arbitrary, capricious, and otherwise an abuse of discretion.

106. HRSA denied Beaumont Hospital the ability to make purchases as a DSH under the 340B Program, even though the hospital undisputably met DSH criteria, by relying on considerations that Congress never authorized and disregarding the overwhelming evidence establishing Beaumont Hospital's eligibility.

107. HRSA has deprived Beaumont Hospital of the 340B pricing to which it is entitled under law based solely on agency-created procedural requirements that appear nowhere in the 340B Statute. In doing so, HRSA acted contrary to Congress's directive that eligible covered

entities receive the benefits of the 340B Program, subject only to the limitations established by the statute.

108. Neither the text nor the legislative history of the 340B Statute contains any indication that Congress intended for covered entities to forfeit their statutory entitlement to 340B pricing based on registration requirements imposed by HRSA.

109. Had Congress intended to require covered entities to comply with agency-created registration requirements as a condition of participation, it knew how to do so and would have included such requirements in the statute, just as it did elsewhere in the 340B Statute.

110. Congress likewise would not have authorized HRSA to withhold or terminate an otherwise eligible covered entity's participation based on agency-created procedural requirements while simultaneously restricting the Secretary's authority to exclude covered entities to circumstances involving systematic, egregious, knowing, and intentional violations of the statutory prohibitions against diversion or duplicate discounts. *See* 42 U.S.C. § 256b(a)(4).

111. By conditioning Beaumont Hospital's ability to participate as a DSH under the 340B Program on compliance with a five-day submission deadline and denying the hospital access to 340B pricing as a DSH for an entire quarter when an attestation was not submitted along with the documents submitted before that deadline, HRSA imposed a penalty untethered to the statutory eligibility criteria established by Congress. HRSA's actions were therefore arbitrary and capricious.

**Beaumont Hospital Will Be Irreparably Harmed Without Court Intervention**

112. Beaumont Hospital faces immediate and irreparable harm arising from HRSA's final decision to prevent Beaumont Hospital from accessing 340B pricing as a DSH for six months.

113. Absent prompt judicial relief, Beaumont Hospital will permanently lose the benefit of millions of dollars in 340B discounts that Congress guaranteed to eligible covered entities.

114. HRSA's unlawful conduct is causing Beaumont Hospital ongoing, concrete harm that cannot be fully remedied through monetary relief or any means other than the declaratory and injunctive relief sought in this action.

**COUNT I**
**(Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)**

115. Beaumont Hospital repeats and realleges paragraphs 1 through 114 as if fully set forth herein.

116. As set forth above, HRSA exceeded the authority granted to it under the 340B Statute by denying Beaumont Hospital access to 340B pricing from approximately April 1, 2026 to July 1, 2026, based solely on the agency's quarterly registration schedule, which Congress did not permit HRSA to create.

117. HRSA further acted arbitrarily, capriciously, contrary to law, and abused its discretion when it denied Beaumont Hospital's April 2026 application for reinstatement as a DSH solely because Beaumont Hospital did not submit an attestation with superfluous documentation that had been uploaded to OPAIS within the five day timeframe established by the agency, thereby depriving Beaumont Hospital of the ability to purchase Orphan Drugs at 340B pricing as a DSH entity between July 1, 2026 and October 1, 2026.

118. For these reasons, HRSA's actions were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; exceeded the agency's statutory authority and limitations; and were taken without compliance with the procedures required by law. See 5 U.S.C. § 706(2)(A), (C)–(D).

119. HRSA's denial of Beaumont Hospital's participation constitutes final agency action within the meaning of the APA, and Beaumont Hospital has no other adequate remedy available to redress its injuries.

120. Unless this Court grants relief, Beaumont Hospital will continue to suffer immediate and irreparable harm as a direct result of HRSA's unlawful actions.

121. Vacatur of HRSA's decision would serve both the public interest and Congress's objectives in enacting the 340B Program by restoring Beaumont Hospital's access to the statutory pricing to which it is entitled and eliminating an agency-imposed barrier to participation that finds no support in the 340B Statute.

## PRAYER FOR RELIEF

**WHEREFORE**, Beaumont Hospital requests that this Court enter judgment in its favor and against HRSA as follows:

A. Entry of judgment declaring that HRSA's decision to prevent Beaumont Hospital from accessing 340B pricing as a DSH between April 1, 2026 and October 1, 2026 was arbitrary, capricious, and contrary to law.

B. Entry of an injunction ordering HRSA to reinstate Beaumont Hospital's DSH status with a retroactive date of April 1, 2026;

C. An order awarding Beaumont Hospital costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

D. Any other and further relief that the Court deems just and proper.

DATED this 3rd day of September, 2026

Respectfully submitted,

POLSINELLI PC

By: /s/ *Chad Landmon*

Chad Landmon
(D.C. Bar No. 990347)
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 783-3300
Fax: (202) 783-3535
clandmon@polsinelli.com

Kyle A. Vasquez (pro hac forthcoming)
150 N. Riverside Plaza, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 463-6338
kvasquez@polsinelli.com

Sabrina Marquez (pro hac forthcoming)
1000 Second Avenue, Suite 3500
Seattle, Washington 98104
Telephone: *(206) 393-5412*
*smarquez@polsinelli.com*

*Attorneys for Plaintiff Corewell Health William Beaumont University Hospital*