UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COREWELL HEALTH WILLIAM BEAUMONT UNIVERSITY HOSPITAL,<br><br>*Plaintiff*,<br><br>v.<br><br>ROBERT F. KENNEDY JR., in his official capacity as Secretary, U.S. Department of Health and Human Services, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:26-cv-03111 (CJN) |

# MEMORANDUM OPINION

Since 2019, Corewell Health William Beaumont University Hospital has purchased drugs from manufacturers at significantly discounted prices through the Section 340B program, a statutory scheme administered by the Health Resources and Services Administration ("HRSA"). Between 2024 and early 2026, Beaumont also qualified as a disproportionate share hospital ("DSH") for discounts on drugs designated for rare diseases or conditions—so-called "Orphan Drugs." But in January 2026, Beaumont feared that it no longer met the statutory criteria to qualify as a DSH. To avoid losing access to Section 340B pricing altogether, it changed its designation from a DSH back to a rural referral center ("RRC") through HRSA's centralized system. When Beaumont later determined that its concern was unfounded, it sought to be re-registered as a DSH, but HRSA permits registration only once per quarter and registration is prospective only (*e.g.*, registration in January takes effect in April). Beaumont therefore lost access to discounted Orphan Drugs for the second and third quarters of this year. Sure that this registration process is unlawful, Beaumont moves for a preliminary injunction reinstating its access to those discounts. The

government opposes relief and moves to dismiss Beaumont's claims for lack of Article III standing.

Although Beaumont does have standing, it has failed to show that it faces irreparable harm absent relief and the other factors do not weigh strongly in favor of an injunction. The Court therefore denies Beaumont's motion.

## I. Background

### A. Legal Background

Section 340B of the Public Health Service Act caps the prices that drug manufacturers may charge for medications sold to certain healthcare providers. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011); 42 U.S.C. § 256b. In exchange for Medicaid reimbursement, drug manufacturers agree to provide "covered outpatient drugs" at discounted prices to "covered entit[ies]." 42 U.S.C. §256b(a)(1); *see also Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455 (D.C. Cir. 2024). "Covered entit[ies]" are limited to certain "healthcare providers that fit within narrow categories." *Novartis*, 102 F.4th at 456 (citing 42 U.S.C. § 256b(a)(4)). Two of those categories are relevant here: those known as disproportionate share hospitals ("DSHs") and rural referral centers ("RRCs"). *See* 42 U.S.C. § 256b(a)(4)(L), (O).

A healthcare provider qualifies as a DSH, if, among other things, it "had a disproportionate share adjustment percentage . . . greater than 11.75 percent" in its last cost reporting period. *Id.* § 256b(a)(4)(L). (The disproportionate share adjustment percentage relates to the number of low-income patients treated by the healthcare provider. *See id.*; 42 U.S.C. § 1395ww(d)(5)(F).) A provider is an RRC if, *inter alia*, its disproportionate share adjustment percentage in its last cost reporting period was "equal to or greater than 8 percent." 42 U.S.C. § 256b(a)(4)(O). Both providers who qualify as RRCs and providers who qualify as DSHs may participate in the Section 340B program, but the statute excludes RRCs from receiving discounted prices on so-

called "Orphan Drugs"—which are designated under the Federal Food, Drug, and Cosmetic Act as drugs for a rare disease or condition. *See id.* § 256b(e).

Although Congress did not give the Secretary of Health and Human Services general "rulemaking authority over the [S]ection 340B program," *Novartis*, 102 F.4th at 456, it did task the Secretary with facilitating certain aspects of it, and the Secretary delegated his responsibilities to HRSA, *see Astra USA*, 563 U.S. at 113. As relevant here, HRSA administers a Section 340B registration and pricing database known as the 340B Office of Pharmacy Affairs Information System (OPAIS). *See* ECF No. 1 ("Compl.") ¶ 50. Healthcare providers who qualify and wish to participate in the Section 340B program register with HRSA through OPAIS. *Id.* ¶ 51. Registration is open between the first and fifteenth day of the first month of each quarter (January, April, July, and October). *See* 77 Fed. Reg. 43342, 43343 (July 24, 2012). A "hospital's eligibility status is prospective only," *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 439 (D.C. Cir. 1999), meaning it becomes effective the quarter following registration, *see* Compl. ¶ 56. Registration in April, for instance, takes effect in July. If a healthcare provider qualifies for more than one type of covered entity, HRSA requires the provider to choose just one and register as a single category. *Id.* ¶ 59. Providers must report any changes in their eligibility immediately through OPAIS. *Id.* ¶ 60.

**B. Factual and Procedural Background**

Beaumont is a private nonprofit hospital located in suburban Detroit. Compl. ¶ 1. For the years 2019 through 2023, Beaumont registered and purchased drugs through the Section 340B program as an RRC. *See* ECF No. 28-2 ("Schaible Decl.") ¶ 6. Starting in 2024, Beaumont also met the qualifications to participate in Section 340B as a DSH, and it changed its registration in January 2024. *Id.* ¶¶ 8–10. That meant starting April 1, 2024, Beaumont could purchase Orphan

Drugs at discounted prices, something it could not do as an RRC. *Id.* ¶ 10; *see also* 42 U.S.C. § 256b(e).

Then, in January 2026, Beaumont identified a possibility that its disproportionate share adjustment percentage would fall below 11.75 percent in its 2025 cost reporting period, meaning the hospital would no longer qualify as a DSH. *See* Schaible Decl. ¶ 17. To ensure no interruption in its Section 340B participation if those projections proved to be true, Beaumont applied to register as an RRC on January 14. *Id.* ¶ 18. HRSA approved Beaumont's registration, and Beaumont's RRC status became effective on April 1, 2026. *Id.* ¶ 19. It therefore no longer qualified to purchase discounted Orphan Drugs.

Beaumont realized in early April that its projections were overly pessimistic; its disproportionate share adjustment percentage turned out to have been higher than 11.75 percent. *Id.* ¶ 21. Beaumont then applied to re-register as a DSH on April 15, 2026, intending to regain DSH status as of July 1, 2026. *Id.* ¶ 22. On April 17, HRSA informed Beaumont that its application was incomplete, and that it should reply with the required documentation by April 22. *Id.* ¶¶ 25–26. After uploading the documents, Beaumont received a notification from OPAIS explaining that its application had nonetheless been rejected because Beaumont had failed to include an attestation from its authorizing official. *Id.* ¶¶ 30–31. As a result, Beaumont had to reapply for DSH status during the July enrollment period, which became effective October 1, 2026. *See id.* ¶ 35.

On September 3, 2026, Beaumont brought claims against HHS and HRSA under the Administrative Procedure Act, 5 U.S.C. § 700 *et seq.*, alleging that the registration requirements that caused Beaumont to lose its DSH status between April 1 and October 1 are unlawful. *See generally* Compl. Beaumont simultaneously filed a motion for preliminary injunction, asking the

Court to order HRSA to reinstate Beaumont's DSH status as of April 1. *See generally* ECF No. 28-1 ("Pl. Mot."). Beaumont claims that during the six months that it was registered as an RRC rather than a DSH, it lost millions of dollars because it could not purchase Orphan Drugs at discounted prices, *see* ECF No. 28-3 ("Field Decl. I") ¶ 12; ECF No. 21-1 ("Field Decl. II") ¶ 6; 42 U.S.C. § 265b(e), which then forced it to divert financial resources away from other priorities like hiring pharmacy staff and an oncology program that treats patients using Orphan Drugs, *see* Field Decl. I ¶¶ 14–17.

In its motion, Beaumont seeks reinstatement of its DSH status so that it can try to recoup at least some of its lost savings from the drug manufacturers through so-called "credit-and-rebill" transactions. *Id.* ¶ 20. If HRSA revises the dates of Beaumont's DSH status in OPAIS, manufacturers may reimburse Beaumont what it paid above the Section 340B price. *Id.* ¶ 21. But the opportunity to seek credit-and-rebill is apparently fleeting; manufacturers impose deadlines after which providers can no longer seek reimbursement, typically one, three, six, nine, or twelve months after the initial sale. *See id.*

The government opposes Beaumont's motion, and itself moves to dismiss on the theory that Beaumont lacks Article III standing. *See* ECF No. 20 ("Def. Mot. & Opp. Br.").

## II. Legal Standard

To obtain the "extraordinary remedy" of a preliminary injunction, *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004), a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest," *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the opposing party, "[t]he balance-of-equities and public-interest factors merge." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025).

The plaintiff "bear[s] the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). Likelihood of success on the merits is a "key issue," and "there is no need to consider the remaining factors" when a plaintiff fails to make that showing. *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083, 1088 (D.C. Cir. 2011). The same goes for irreparable harm: A "failure to show a likelihood of irreparable harm [is], standing alone, sufficient to defeat the motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining that "failure to show any irreparable harm" alone is reason enough to deny a preliminary injunction).

"To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). The Court must "accept facts alleged in the complaint as true and draw all reasonable inferences" in the plaintiff's favor, *id.*, but the Court may also consider materials outside of the complaint, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

## III. Analysis

Beaumont contends that HRSA's registration requirements for covered entities are unlawful under the APA because (1) nothing in the text of Section 340B gives HRSA the authority to enforce its registration scheme, and (2) its requirements are arbitrary and capricious. *See generally* Pl. Mot. The hospital argues that, without a preliminary injunction ordering HRSA to retroactively reinstate its DSH status as of April 1, it will suffer irreparable harm because the opportunity to seek reimbursement from drug manufacturers is limited. *See id.* at 31–36. For the

reasons discussed below, the Court concludes that Beaumont has failed to demonstrate it will suffer irreparable harm absent relief (and the other *Winter* factors do not weigh decisively in Beaumont's favor).

**A. Although Beaumont Has Standing, It Fails to Show Irreparable Harm.**

The Court begins with Article III standing and irreparable harm. Although the former is relevant to the merits inquiry (because Beaumont must show it likely has standing to show it is likely to succeed on the merits), here the concepts are related and so the Court takes up the standing question first.

**1. Beaumont Has Article III Standing.**

The government argues that Beaumont lacks standing because its injuries are not "fairly traceable" to HRSA's registration requirements. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015); *see also* Def. Mot. & Opp. Br. at 11–12. According to the government, because Beaumont voluntarily applied to change its status from DSH to RRC in January, and then failed to attach the attestation to its application, it is Beaumont (and not HRSA's registration scheme) that is to blame for its loss of DSH status and savings on Orphan Drugs. *See* Def. Mot. & Opp. Br. at 11–12. For the purposes of standing, an injury is self-inflicted "where the plaintiff's claimed injury [i]s clearly independent of agency action," *Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 230 (D.D.C. 2017), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018), and that is not clearly the case here. Assuming the merits of Beaumont's allegations in its complaint, which the Court must do, *see In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008), Beaumont's loss of DSH status would not have occurred but for HRSA's quarterly registration scheme and its requirement that providers register as just one type of covered entity, *see* Compl. ¶¶ 59–61, 66–70. Put differently, but for HRSA's allegedly unlawful actions, even with its own independent decisions, Beaumont would

have been treated as a DSH beginning on April 1, 2026, and it would not have lost the discounted prices for Orphan Drugs over the next six months.

The government also contends that Beaumont's injury is not redressable because relief depends on future third-party conduct, *i.e.*, the manufacturers honoring the credit-and-rebill transactions. To show redressability in circumstances involving third-party conduct, the plaintiff must prove a "substantial likelihood" that the third party will act as expected. *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 384 (D.C. Cir. 2020); *see also Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022). Contrary to the government's view, Beaumont has done so here by asserting in a sworn declaration that it has a contractual right to seek credits for prior purchases under its agreements with manufacturers. *See* Field Decl. II ¶ 4.

The government relies on *University Medical Center of Southern Nevada v. Shalala*, a case in which a hospital similarly sought reinstatement of its covered entity status under Section 340B to obtain retroactive discounts from manufacturers. *See* 173 F.3d 438, 440 (D.C. Cir. 1999). The Court of Appeals held that the hospital had not shown redressability because "the retroactive discounts apparently depend[ed] on whether the manufacturers—who [we]re not parties to th[e] action—could be persuaded to pay them." *Id.* at 441–42. But the court went on to say that "[i]f it could be said that UMC was *legally entitled* to get the discounts . . . then we might have a different situation." *Id.* at 442. That "different situation" is presented here, where Beaumont says just that.

**2. Beaumont Has Not Shown Irreparable Harm.**

Although Beaumont has Article III standing, it has failed to show irreparable harm. Its claimed harm is, at bottom, a financial loss: Beaumont paid millions of dollars more for Orphan Drugs than it otherwise would have between April 1 and October 1. Economic harm, however, generally cannot constitute irreparable harm unless "the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also id.* ("It

is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm.") Beaumont makes no claim that its loss is so dire, and it otherwise fails to show why its economic loss rises to the level of irreparable harm.

As an initial matter, the nature of Beaumont's economic harm is mismatched to the types of harms preliminary injunctions are typically intended to address. Successful plaintiffs show that "irreparable injury is 'likely' to occur" by providing either "proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* at 674. In other words, the injury is "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (emphasis in original) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F.Supp. 297, 307 (D.D.C. 1976)). Here, because Beaumont has had DSH status since October 1, it argues neither that its previous overpayment for Orphan Drugs is likely to occur again nor that a new overpayment will happen soon. In that sense, Beaumont's injury has no imminence at all—it is complete.[1] To be sure, Beaumont argues that those overpayments forced it to make changes to its operations and staffing. But those decisions were also made in the past, and because such changes could follow any financial hit to a business, that alone cannot turn past monetary losses into imminent harm.

Perhaps because of its unusual position, Beaumont hangs its case for irreparable harm on the fact that those losses will be unrecoverable if manufacturers' lookback periods expire before Beaumont gets relief. *See* Pl. Opp. & Reply Br. at 21–22. Although economic loss generally does not constitute irreparable harm absent dire circumstances, some courts have held that "a lesser

---

[1] This is evident in one of Beaumont's supporting declarations, which says that the preliminary injunction would allow the hospital to "*mitigate* the financial losses" it incurred. Field Decl. II ¶ 13 (emphasis added). Preliminary injunctive relief is generally intended to prevent harm, not mitigate it.

showing is permissible when the economic injury at issue is unrecoverable." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020). It is true that Beaumont cannot recover monetary damages from HRSA under the APA, and Beaumont otherwise assumes HRSA has sovereign immunity for other claims it might assert. But stepping back, Beaumont's contention that its overpayments are (or will be) unrecoverable is in some tension with its stance for the purposes of standing that it will be able to recover the funds from manufacturers. As the Court explained above, Beaumont has demonstrated that at least *some* of the funds are recoverable, even if the period in which that is true may be shrinking.[2]

But even assuming that Beaumont's funds would be largely unrecoverable absent an injunction, the hospital still cannot meet the "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). First, Beaumont erroneously suggests that the irreparable harm factor is automatically met when financial losses are unrecoverable. Pl. Opp. & Reply Br. at 21–22. The "inability to recover economic losses can more accurately be considered as a factor in determining whether the movant has shown irreparable harm." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014). After all, if Beaumont was right, "a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong," effectively "nullifying that requirement." *Id.*; *see also Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (explaining that unrecoverable damages are not irreparable *per se* because "[a]ny movant that could show any

---

[2] The government argues that Beaumont's waiting until September 3, 2026 to file its complaint and motion for preliminary injunction in this case weighs against a finding of irreparable harm. *See* Def. Mot. & Opp. Br. at 24; *see Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000) (finding that "delay in bringing th[e] action further undercuts" the plaintiff's "allegation of irreparable harm"). While Beaumont surely would have benefitted by bringing its claims earlier, the Court does not rest its irreparable harm analysis on that fact.

damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard"). That Beaumont's "economic losses may be unrecoverable does not absolve" the hospital "from its 'considerable burden' of proving that those losses are '*certain, great and actual*.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (emphasis in original) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)). Unlike for Article III standing, under which Beaumont need only show, say, $1 of harm, Beaumont must show that its economic harm absent an injunction, even if unrecoverable, will be "significant." *Air Transp. Ass'n*, 840 F. Supp. 2d at 335. And to do so it must "adequately describe and quantify the level of harm" that it faces. *Id.* at 336 (quoting *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Rsrv. Sys.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011)).

The government argues that Beaumont fails to offer specific evidence to support a showing of certain, great, and actual losses absent a preliminary injunction, *see* ECF No. 26 ("Def. Reply Br.") at 9, and the Court agrees. "Conjecture and 'vague and unsupported' assertions of harm are not sufficient." *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 548 (D.D.C. 2016) (quoting *Brodie v. U.S. Dep't of Health & Hum. Servs.*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010)). Beaumont has failed to adequately explain how its millions of dollars in lost Section 340B savings, *see* Field Decl. I ¶ 12; Field Decl. II ¶ 6, lead to a present threat of irreparable harm. Beaumont asserts that it "has identified numerous historical transactions" and "a significant percentage of the orphan drug purchases" during the relevant "period that would qualify for credit-and-rebill under its agreements with" manufacturers. Field Decl. II ¶¶ 6, 8. But the hospital does not say what portion of the millions of dollars in losses is encompassed by those transactions. While the hospital does state that manufacturers' lookback periods are "typically one, three, six, nine, or twelve months," Field Decl. I ¶ 21, it does not specify which of those periods actually applies to the transactions

occurring in the six-month period here. Based on Beaumont's evidence, the Court is left wondering whether $5,000, $500,000, or $5 million is still eligible for reimbursement. And critically, Beaumont does not offer any evidence to show how its millions in losses (or however much is still recoupable) actually affect its bottom line, *e.g.*, what percentage of its annual revenues the losses constitute.[3]

Lastly, Beaumont asserts that its employees "have expended considerable time and effort securing alternative funding sources, assessing clinically appropriate therapeutic alternatives, and implementing cost-containment measures to manage the higher acquisition costs of Orphan Drugs." Field Decl. I ¶ 13. But the hospital does not specify how much alternative funding it secured. That would affect whether Beaumont will suffer future irreparable harm absent relief, and it is yet another loose end that Beaumont has left untied. It is Beaumont's burden to demonstrate that its harm in the absence of a preliminary injunction will be "significant," *Air Transp. Ass'n*, 840 F. Supp. 2d at 335, and it has failed to do so here.[4]

**B. The Likelihood of Success on the Merits Factor Does Not Outweigh Beaumont's Failure to Show Irreparable Harm.**

While Beaumont's motion for a preliminary injunction fails for lack of irreparable harm, the Court also addresses the three other *Winter* factors. To start, Beaumont's likelihood of success

[3] Beaumont does offer evidence that Corewell, the nonprofit health system to which Beaumont Hospital belongs, laudably devoted more than $1.3 billion in 2024 to community benefit programs. *See* Field Decl. I ¶ 7.

[4] Beaumont also asserts reputational injury: its loss of savings "threatens lasting damage to [its] reputation and the goodwill it has developed with patients, referring physicians, and the communities that rely on its services." Pl. Mot. at 34. But that alleged reputational harm is entirely dependent on how much money Beaumont stands to lose in the absence of a preliminary injunction, and for the reasons described, Beaumont fails to meet its burden to show that amount is "great." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52.

on the merits presents a close question that does not militate strongly in favor of granting a preliminary injunction.

### 1. HRSA's Quarterly Delay in Registration May Be Unlawful, But It Is a Close Question.

Beaumont contends that HRSA's refusal to recognize the hospital as a DSH between April 1 and October 1 is unlawful because HRSA lacks the statutory authority to impose its prospective registration scheme, which includes a three-month delay between registration and effective date. *See* Pl. Mot. at 17–25. In Beaumont's view, once a healthcare provider satisfies the statutory criteria to be a covered entity, HRSA has no authority to withhold Section 340B pricing for a quarter or more. *Id.* As a result, the hospital contends, HRSA acted in excess of its statutory authority by denying Beaumont DSH status between April 1 and October 1 even while Beaumont met all statutory criteria. *Id.*

To support its view, Beaumont starts by pointing out that, of the requirements that Section 340B expressly imposes on covered entities, none expressly grants the agency authority to make prospective registration a condition of participating in the Section 340B program. *Id.* at 19–20. In addition to the threshold DSH eligibility requirements (*e.g.*, a disproportionate share adjustment percentage greater than 11.75 percent in the last cost reporting period, 42 U.S.C. § 256b(a)(4)(L)), Section 340B requires covered entities to refrain from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity" and double dipping, *i.e.*, taking "duplicate discounts" by "receiving the [S]ection 340B discount on drugs also subject to a Medicaid rebate." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) (citing 42 U.S.C. § 256b(a)(5)(A)(i), (a)(5)(B)). According to Beaumont, Congress imposed those three requirements at the exclusion of all others. Pl. Mot. at 19–20. Nothing, it says, permits HRSA to

withhold covered entity status for three months or more for lack of registration from otherwise qualifying providers.

The government counters that its registration requirement is a procedural mechanism that is necessarily implied by the agency's powers under Section 340B. Def. Mot. & Opp. Br. at 13–19. It principally relies on Section 340B(a)(9), which mandates that the agency "notify [drug] manufacturers . . . of the identities of covered entities under this paragraph, and of entities that no longer meet the requirements [prohibiting resale and duplicate discounts] or that are no longer certified pursuant to paragraph (7)." 42 U.S.C. § 256b(a)(9). To identify covered entities and inform manufacturers of providers that no longer meet the covered entity requirements, the government argues, HRSA must have some way to know which providers intend to participate in Section 340B and which of those are eligible to participate. *See* Def. Mot. & Opp. Br. at 14. In the government's view, some type of up-front registration is therefore necessary, and its quarterly scheme "is simply the procedural mechanism the agency has selected to facilitate providers' opting in to participation." *Id.* at 16; *see also id.* at 13–14 ("[I]t is a 'very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978))). And the government rejects Beaumont's argument that the three-month delay is a substantive requirement imposed on providers, arguing that "[a] requirement governing the means by which a regulated party avails itself of a statutory scheme is classically procedural." Def. Mot. & Opp. Br. at 16.

The government is correct that HRSA's responsibilities under Section 340B necessarily imply that it must have the authority to verify that participating healthcare providers meet all statutory requirements. Beaumont does not disagree. At oral argument, counsel for Beaumont explained that the hospital does not challenge HRSA's authority to evaluate whether a healthcare

provider meets the requirements for DSH status *at some point*. *See* ECF No. 27 ("Oct. 19, 2026 Hearing Tr.") 7:3–18. Beaumont thus does not necessarily take issue with registration itself, but rather with HRSA's imposing a three-month delay after registration before covered entity status becomes effective. *Id.* Thus, the question is whether HRSA has the authority to use its prospective registration to withhold covered entity status from an otherwise qualified healthcare provider for at least three months.

That is a difficult and close question, although Beaumont's view of the statute has significant force. The hospital points to a recent decision by another judge of this Court holding that HRSA lacked authority to condition participation in the Section 340B program on registration for offsite facilities of qualified hospitals. *See Albany Med. Health Sys. v. Health Res. and Servs. Admin.*, No. 1:23-cv-03252, 2026 WL 592593, at *7–10 (D.D.C. Mar. 3, 2026). The court concluded that nothing in the text of Section 340B "allow[s] HRSA to delay a statutorily qualified child site from 340B participation until the agency has signed off on eligibility. That is a precondition that finds no basis in the statutory text." *Id.* at *9.

Here, that would mean that Section 340B does not authorize HRSA to delay a provider's DSH status for a quarter or more while the statutory criteria are otherwise met. That view is supported by Section 340B's expressly including agency certification for certain covered entities, but not DSHs. In particular, certain healthcare providers receiving government funding related to treatment of HIV, sexually transmitted diseases, or tuberculosis may qualify for covered entity status "only if the entity is *certified* by the Secretary." 42 U.S.C. § 256b(a)(4)(J)–(K), (a)(7) (emphasis added). The statute's use of "certify" suggests that, for those categories of entities, the agency has some authority over *when* those providers obtain covered entity status. The verb "identify," in the provision on which the government relies here, may not confer the same power.

Beaumont's take is further bolstered by the responsibilities that Congress expressly gave the agency under Section 340B, which concern identification and verification of covered entity status rather than gatekeeping. Each relevant responsibility requires that the agency determine whether the healthcare provider is eligible for covered entity status when it submits its information, but none necessarily permits the agency to delay when that status takes effect. For instance, Congress tasked the Secretary with "[t]he development of procedures to enable and require covered entities to regularly update (at least annually) the information on the [agency's website] relating to this section," *id.* § 256b(d)(2)(B)(i), and the agency must "verify the accuracy of [that] information," *id.* § 256b(d)(2)(B)(ii). Section 340B further requires HRSA to make available online "the applicable ceiling prices for covered outpatient drugs . . . in a manner (such as through the use of password protection) that limits such access to covered entities and adequately assures security . . . ."[5] *Id.* § 256b(d)(1)(B)(iii). HRSA could satisfy its obligations under each of these provisions without a three-month delay in qualification.

On the other hand, even if Beaumont is right that Section 340B does not permit HRSA to delay the effective date of an otherwise eligible provider's DSH status, the statute does not necessarily require the agency to permit access to Section 340B pricing without successful

[5] The government contends that Congress ratified HRSA's registration scheme when it amended Section 340B in 2010. Def. Mot. & Opp. Br. at 15. It is true that, in some circumstances, Congress's later amendments may bless an agency's interpretation of a statute. *See Ardelyx, Inc. v. Kennedy,* 179 F.4th 947, 960 (D.C. Cir. 2026) ("When Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986))). But that is not necessarily the case here. Unlike in *Ardelyx*, where Congress "expressly acknowledged" the agency's interpretation in subsequent enactments, *id.*, Congress here said nothing about HRSA's registration scheme. Instead, Congress tasked the agency with additional responsibilities like "verify[ing] the accuracy of" providers' information, language that does not strongly endorse the agency's ability to delay the effective date of status.

registration in OPAIS. For example, it may be consistent with the statute for HRSA to continue to require healthcare providers to wait to purchase Section 340B drugs until they are approved by the agency, perhaps so long as the effective date of their covered entity status is backdated to the date on which they applied.[6] To be sure, that reading may be at odds with the decision in *Albany*, which seems to say that access to Section 340B pricing should be automatic as soon as the healthcare provider meets—or believes it meets—the statutory criteria. *See* 2026 WL 592593, at *10. But automatic access makes more sense in the context of offsite facilities of hospitals already participating in the Section 340B program than hospitals themselves. Here, it is hard to imagine that Section 340B requires manufacturers to sell drugs at discounted prices to any hospital that simply declares itself eligible. HRSA could not fulfill its express duty to limit disclosure of discounted prices to covered entities only (through means like password protection), *see* 42 U.S.C. § 256b(d)(1)(B)(iii), if entities had the right to just knock on the manufacturers' doors.

But the government's view that HRSA's scheme is a procedural rule rather than a substantive requirement also has some force. "In general, a procedural rule 'does not itself alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 174 F.3d 206, 211 (D.C. Cir. 1999)). And HRSA does not appear to require healthcare providers to submit any information through OPAIS that goes beyond or "alters" the eligibility requirements listed in the statute. In that sense at least, quarterly registration is not an additional requirement but simply the way the agency decided it was best for healthcare providers to "present themselves"

---

[6] Beaumont acknowledges that the flipside could be true: The agency could retroactively revoke a healthcare provider's DSH status if it later discovered the provider did not actually meet the eligibility requirements. *See* Oct. 19, 2026 Hearing Tr. 6:11–18.

for participation in the Section 340B program. *Id.* That the agency may need to use a quarterly system to, say, manage the volume of applications, does not strike the Court as unreasonable. At the very least, for the purposes of granting the "extraordinary remedy" of a preliminary injunction, *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004), the Court cannot conclude that Beaumont is very "likely" to demonstrate that HRSA's prospective registration regime is a substantive barrier to covered entity status rather than a reasonable procedural mechanism.

**2. HRSA's Denial of Beaumont's Registration Because It Failed to Submit Its Attestation Within Five Days Was Not Arbitrary and Capricious.**

Beaumont next argues that HRSA's denial of its registration in April because of its failure to submit the required attestation within five days was arbitrary, capricious, and an abuse of discretion. Pl. Mot. at 25–31. Its arguments here are less compelling.

Beaumont contends that denying its application for DSH status was arbitrary and capricious because the attestation requirement and five-day deadline are not found in the text of Section 340B. Pl. Mot. at 27–29. The Court has little trouble concluding, however, that the attestation and a five-day response deadline are procedural rules that reasonably arise out of the agency's power to verify the eligibility of covered entities. HRSA is "free to fashion" such procedural rules to carry out its statutory duties. *Vt. Yankee*, 435 U.S. at 544. And Beaumont has failed to show that it was arbitrary or capricious for the agency to rely on the hospital's violation of these procedural rules to deny its application. A rule can be procedural even if "failure to observe it might cause the loss of substantive rights." *JEM Broad. Co. v. Fed. Commc'ns Comm'n*, 22 F.3d 320, 327 (D.C. Cir. 1994) (quoting *Ranger v. Fed. Commc'ns Comm'n*, 294 F.2d 240, 244 (D.C. Cir. 1961)). Plus, Beaumont makes no case for why a five-day response deadline in particular is unreasonable.

Beaumont also claims that HRSA acted arbitrarily and capriciously for rejecting its application for lack of attestation when the agency had evidence from previous filings that could have established Beaumont's DSH eligibility. Pl. Mot. at 29–30. But healthcare providers' eligibility can change over time, which means that historical submissions cannot substitute for evidence of current status. For instance, private nonprofit hospitals that wish to participate as a DSH must have "a contract with a State or local government to provide health care services to low income individuals," 42 U.S.C. § 256b(a)(4)(L)(i), and the government notes that a provider's contract with the state could be many years old, *see* Def. Reply Br. at 3. In that case, a recent attestation may be the only proof that the contract is still in effect. That previous submissions may not reflect a provider's current status is further illustrated by Beaumont's own concern in January that it might lose DSH status in 2026 due to its 2025 cost reporting. *See* Schaible Decl. ¶ 17. Beaumont fails to persuade the Court that an attestation is not a reasonable way to confirm that a provider's documentation is accurate and up to date.

### C. The Balance of Equities and Public Interest Factors Also Do Not Militate in Favor of Granting an Injunction.

Neither the balance of equities nor the public interest, which merge here because the government is a party, *see Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025), work strongly in Beaumont's favor. "There is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), but as discussed, it is not clear that HRSA's actions were unlawful. As for the balance of equities, while there might be little harm to HRSA from an order directing it to reinstate Beaumont's DSH status, Beaumont has also failed to establish it will suffer significant irreparable harm absent such an order. This factor is at best a wash.

## IV. Conclusion

For the foregoing reasons, the Court denies both Beaumont's Motion for Preliminary Injunction, ECF No. 28, and the government's Motion to Dismiss, ECF No. 20. The Court will issue an order contemporaneously with this decision.

DATE: October 29, 2026

CARL J. NICHOLS
United States District Judge